***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence. Having reviewed the competent evidence of record, the Full Commission hereby reverses the Opinion and Award and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the Deputy Commissioner hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Employers Insurance of Wausau, a mutual company, was the insurance carrier on the risk for defendant-employer Regis Corporation on the date of plaintiff's injury.
3. An employee-employer relationship existed between plaintiff and defendant-employer on June 1, 1998, the date of the admitted accident.
4. Plaintiff sustained a compensable injury by accident to her left shoulder and acromioclavicular joint (the hinge joint between the collar bone and shoulder blade) arising out of her employment on June 1, 1998.
5. All parties are properly before the Commission; and the Commission has jurisdiction over the parties and subject matter.
6. Plaintiff's average weekly wage at the time of her injury was $398.91, yielding a compensation rate of $265.94 per week.
7. The parties stipulated into evidence, as Stipulated Exhibit 1, a packet of plaintiff's medical records, Industrial Commission forms, Interrogatory Responses and personnel records.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 38-year-old female who had obtained a GED. Plaintiff has experience working as a factory worker, waitress and hairstylist.
2. On June 1, 1998, plaintiff was working for defendant-employer as a manager and hairstylist when she slipped on the salon's floor and landed on her left shoulder and neck. On June 1, 1998, plaintiff sustained an admittedly compensable injury by accident arising out of her employment.
3. On the evening of her injury, plaintiff went to the emergency room. Plaintiff was taken out of work for two days and instructed to consult Dr. Richard Alioto, an orthopaedic surgeon, if needed. Plaintiff presented to Dr. Alioto on June 5, 1998 and was diagnosed with left AC joint sprain probably grade 1 to 2. On that date, plaintiff's neck appeared uncomfortable but she did not complain of neck pain; however, she was complaining of pain in her left arm and shoulder.
4. Plaintiff returned to Dr. Alioto on June 11, 1998 continuing to complain of pain in her left shoulder and was again diagnosed with a left AC joint sprain.
5. On June 16, 1998, defendants filed a Form 60 admitting plaintiff's right to compensation for her injury on June 1, 1998. On the Form 60 plaintiff's injury was described as "MPRT" (pain in multiple body parts). As of the Deputy Commissioner hearing, plaintiff continued to be out of work and to receive temporary total disability benefits.
6. By June 25, 1998, Dr. Alioto was of the opinion that plaintiff was recovering. On July 9, 1998, plaintiff called Dr. Alioto reporting that she was doing well and working normally.
7. On January 7, 1999, approximately six months after her last visit, plaintiff returned to Dr. Alioto and reported that she had been doing a lot of work because two of her employees were out sick. She experienced pain for about a week, radiating up into the neck mostly in the shoulder area and down into her arm. At that time, Dr. Alioto felt that plaintiff had definite signs of impingement, and he diagnosed plaintiff with rotator cuff tendonitis and AC joint arthritis.
8. On January 26, 1999, plaintiff presented to Dr. Alioto complaining of excruciating pain in her neck that was different from any pain she had previously experienced. The pain ran up the side of her neck and into her eye and head. Dr. Alioto diagnosed plaintiff with a new cervical strain, prescribed a Medrol Dosepak and wrote plaintiff out of work. Plaintiff returned to Dr. Alioto on February 2, 1999 and her cervical strain was much improved after therapy. Dr. Alioto released plaintiff to sedentary work, with no lifting and no cutting hair for two weeks.
9. On February 25, 1999 plaintiff reported to Dr. Alioto that she returned to work for four-hour shifts and then eight-hour shifts and her pain returned "with a vengeance." Plaintiff's pain radiated up the back and into her shoulder. Dr. Alioto allowed plaintiff to return to work on four-hour shifts.
10. In early March 1999, plaintiff underwent a distal clavicle resection acromioplasty of the left AC joint performed by Dr. Alioto.
11. On or about July 1, 1999, plaintiff returned to Dr. Alioto complaining of neck and shoulder pain. At that time, Dr. Alioto referred plaintiff to Dr. William F. Lestini, a board-certified orthopaedic surgeon, for her neck complaints.
11. On September 28, 1999, plaintiff presented to Dr. Lestini and told him that she had felt immediate pain in her neck and left shoulder at the time of her injury on June 1, 1998. An MRI of plaintiff's cervical spine revealed degenerative changes at C3-4, C5-6 and C6-7. The MRI further revealed no significant signs of any stenosis or nerve impingement. On September 28, 1999, plaintiff's neck pain was local with no radiation.
12. On October 25, 1999, plaintiff underwent a left C8 nerve root block, which showed mild stenosis of the nerve root sleeve and degenerative spurring. On November 18, 1999, plaintiff underwent a CT myelogram. The myelogram revealed slight bulging at C3-4, 5-6 and 6-7 as well as a small right-sided disc protrusion at C6-7. The tests also showed some slight underfilling of the nerve root at C6-7.
13. EMG nerve conduction studies performed in February 2001 were read as normal with no radiculopathy or neuropathy.
14. Dr. Lestini felt that plaintiff had the option of surgery and was a good surgical candidate. He noted that plaintiff had experienced long-standing pain for which conservative treatment failed. He stated that plaintiff's symptoms correlated to the changes shown on the studies.
15. On February 10, 2000, Dr. Lestini was of the opinion that plaintiff was at maximum medical improvement for her neck and retained a 5% permanent partial impairment of the back.
16. On March 2, 2000 plaintiff returned to Dr. Alioto complaining of pain primarily in the neck area, radiating into the left arm. Despite plaintiff's continued pain with little improvement, Dr. Alioto found that plaintiff was at maximum medical improvement and retained a 14% permanent partial impairment of the left upper extremity.
17. Dr. Alioto was of the opinion that plaintiff's left AC joint contusion, separation, arthritis and rotator cuff tendonitis are all consistent with her June 1, 1998 fall and were caused by this accident.
18. Dr. Alioto was of the opinion that plaintiff's cervical condition was possibly related to her fall and he suspected that her cervical stenosis was aggravated by her fall on June 1, 1998.
19. On July 20, 2000, plaintiff was issued work restrictions by Dr. Lestini as follows: no lifting greater than 30 pounds occasionally and 15 pounds frequently; no frequent twisting, bending or stooping; and no working without a posture change every 60 minutes.
20. Dr. Lestini stated and the Commission finds that the fall aggravated the condition in plaintiff's neck and caused her neck pain.
21. After extensive vocational rehabilitation, plaintiff obtained a receptionist position with Benson Chiropractic in July 2000. On July 24, 2000, defendants filed a Form 28T, Notice of Termination of Compensation, based upon this employment. Plaintiff's job duties at Benson Chiropractic included turning on the office machines, lights, computers, etc.; taking patients into the treatment rooms; typing patient information into a computer; occasionally taking out the trash; sitting or standing as she chose; answering the phones and calling regarding insurance information.
22. Plaintiff took pain medication and iced her neck at night in order to keep her job. A special headset was ordered because holding the telephone in a normal position caused plaintiff severe pain. When plaintiff first began her return to work attempt, she worked 35 to 40 hours per week. However, because of her neck pain, her employer, Dr. Carl Horkavy, reduced her hours in an attempt to allow her to continue working.
23. Dr. Horkavy stated in a July 24, 2000 letter that plaintiff's position was a "`non-stop'" position requiring use of arms, hands, shoulders, neck, and back while performing phone and computer tasks, as well as, file and records management." Dr. Horkavy stated that plaintiff had great difficulty performing these tasks without pain and had missed work due to pain. The vocational consultant, Allison Parker, also stated that plaintiff had continued complaints of pain that increased with activity.
24. On August 24, 2000, plaintiff quit her position with Benson Chiropractic due to her continued pain, and defendants reinstated payment of compensation to plaintiff.
25. On September 29, 2000 defendants sent a Form 21 Agreement for Payment of Compensation to plaintiff's former counsel for payment of temporary partial disability compensation based on plaintiff's return to work with Dr. Horkavy. The Form 21 listed plaintiff's injuries as "cervical or left AC joint strain/separation involving plaintiff's left neck and/or shoulder." The record does not disclose the reasons the Form 21 was never completed or filed with the Commission.
26. On November 1, 2000 defendants filed a Form 33 Request for Hearing seeking to terminate benefits on the grounds that plaintiff was no longer disabled. The Form 33 does not show as an issue causation of plaintiff's neck condition and lists her injuries as "cervical or left AC joint strain/separation involving plaintiff's left neck and/or shoulder."
27. In January 2001 plaintiff returned to Dr. Lestini with the authorization of defendant-carrier for the purpose of considering surgery since she could no longer tolerate the pain and was not able to work. Dr. Lestini agreed to proceed with surgery.
28. On January 15, 2001 defendant-carrier sent plaintiff to Dr. James S. Fulghum, a board-certified neurosurgeon, for a second opinion. Upon examination of the 1999 and 2000 MRIs, Dr. Fulghum found plaintiff had persistent ridging disc defect at C3-4, 5-6 and 6-7 with no evidence of cord displacement or axial or foraminal enclosure; i.e., there was no pressure on the spinal nerves or cord. Dr. Fulghum ordered a repeat nerve conduction study which was normal.
29. Dr. Fulghum was of the opinion that there was no evidence of any acute radiculopathy in plaintiff's left upper extremity or related neck region. While Dr. Fulghum did not recommend surgery, he stated that the presence of neck and shoulder pain, as well as the degenerative changes in plaintiff's spine, supported fusion surgery as a reasonable option.
30. Dr. Fulghum's opinion was that plaintiff's fall could have caused an acceleration of an underlying, non-symptomatic degenerative disc disease. He also explained the cervical ridging that plaintiff has could be accelerated or compounded by trauma.
31. Dr. Fulghum agreed with Dr. Lestini's assessment that plaintiff retains a 5% permanent partial impairment of the back.
32. On February 15, 2001, plaintiff returned to Dr. Lestini who tried to stress non-operative treatment for plaintiff. If plaintiff could tolerate the pain, Dr. Lestini recommended no surgery, but plaintiff chose to proceed with the surgery. Although a two-level anterior fusion surgery was scheduled, defendant-carrier refused to approve it and the surgery did not occur.
33. All of the medical appointments and treatment for plaintiff's neck problems were paid by defendants and defendant-carrier's rehabilitation nurse accompanied plaintiff to her doctors' appointments.
34. Plaintiff's cervical stenosis and degenerative disc disease were aggravated or accelerated by the June 1, 1998 injury by accident.
35. Plaintiff has not reached maximum medical improvement of her cervical neck condition. As the result of plaintiff's compensable injury by accident and the resulting cervical condition, plaintiff was disabled and unable to earn wages in her regular employment or in any other employment after August 24, 2000 and continuing to the present.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 1, 1998, plaintiff sustained a compensable injury by accident arising out of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6). The compensable injuries sustained on June 1, 1998 include left AC joint injury, tendonitis and arthritis, as well as an aggravation of plaintiff's pre-existing cervical stenosis and degenerative disc disease.
2. The doctrine of estoppel applies to workers' compensation cases and may be used to ensure coverage of a work — related injury. See, Carrollv. Daniels and Daniels Construction Co., Inc., 327 N.C. 616, 398 S.E.2d 325
(1990). In Purser v. Heatherlin Properties, 137 N.C. App. 332,527 S.E.2d 689 (2000), the Court of Appeals stated that "[t]he doctrine of estoppel is a means of preventing a party from asserting a defense which is inconsistent with his prior conduct." Id. at 337,527 S.E.2d at 692.
3. In this case defendants accepted plaintiff's injuries as compensable by filing a Form 60 on June 16, 1998. Defendants directed plaintiff's medical treatment, paid for all medical treatment including that for her neck, and paid plaintiff disability compensation for the period plaintiff was out of work. Defendants continued to pay compensation after plaintiff reached maximum medical improvement of her shoulder injury on March 2, 2000. The Form 33 Request for Hearing filed by defendants showed that plaintiff sustained an injury to her neck. The first time defendants raised the issue of causation of plaintiff's neck problems was on the pre-trial agreement entered into at the Deputy Commissioner hearing.
4. N.C. Gen. Stat. § 97-18(d) provides that where compensability is uncertain, defendants have 90 days within which to pay compensation without prejudice while investigating the claim. If defendants do not deny the claim within 90 days, defendants waive the right to contest compensability or liability for the claim. Id. In this case, defendants made payments pursuant to a Form 60 and failed to deny compensability for the cervical injuries within 90 days after the injury by accident. In fact, defendants paid compensation to plaintiff until the Deputy Commissioner's Opinion and Award was issued. The filing of a Form 60, combined with making payments for disability and for medical treatment, constitutes an acceptance of liability. Kanipe v. Lane Upholstery,141 N.C. App. 620, 540 S.E.2d 785 (2000). Therefore, defendants are estopped to deny liability for plaintiff's cervical problems and are deemed to have accepted liability for the aggravation of plaintiff's neck condition.
5. A Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Simsv. Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277, disc.rev. denied, 353 N.C. 729, 550 S.E.2d 782 (2001). Plaintiff met her burden of proving that she is physically, as a result of the work-related injury, incapable of any work. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). Defendants have not shown that suitable jobs are available to plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account both physical and vocation limitations. Demery v. Perdue Farms, Inc., supra.
6. As the result of the compensable injury by accident and subsequent aggravation of plaintiff's cervical problems, plaintiff was disabled and is entitled to receive temporary total disability compensation at the rate of $265.94 per week from August 24, 2000 and continuing until further Order of the Commission. Defendants are entitled to a credit for compensation already paid during this period of time. N.C. Gen. Stat. §97-29.
7. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the injury by accident as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including medical treatment for plaintiff's cervical condition. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay temporary total disability compensation to plaintiff at the rate of $265.94 per week beginning August 24, 2000 and continuing until further Order of the Commission.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of the injury by accident, including treatment of plaintiff's cervical condition.
3. Plaintiff's motion for the cost of plaintiff's copies of the deposition transcripts of Dr. Fulghum and Dr. Lestini is DENIED.
4. Defendants shall pay the costs due the Commission, including an expert witness fee in the amount of $690.00 to Dr. Fulghum and $300.00 to Dr. Lestini to the extent these fees have not already been paid.
This the 17th day of April 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER